IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

WAYLAND DEE KIRKLAND,

      Plaintiff,

      v.                              Case No. 16-CV-2079-JAR

MARCEL LARIOS, et al.,

      Defendants.

## MEMORANDUM AND ORDER

Plaintiff Wayland Dee Kirkland, proceeding *pro se*, filed suit against Marcel Larios, Troy Wilson, Jordan Powell, Justin Wadkins, and Sarah Hollon, who are all Franklin County, Kansas Jail officials (collectively, "Franklin County Defendants"), as well as Melany McClure, Sergeant Matt Doe, John Does I, III-IV, and Denise Doe V. Plaintiff alleges claims of use of excessive force in violation of the Fourteenth Amendment[1] of the United States Constitution against Officers Larios, Powell, and Wilson. There is also a passing reference to assault under Kansas state law.[2] He further alleges deprivation of access to courts in violation of the Fourteenth Amendment against Administrator Wadkins and Corporal Hollon because he was not given writing materials while in solitary confinement. This matter is before the Court on the Franklin County Defendants' Motion for Summary Judgment (Doc. 34). Plaintiff has responded to

---

[1] Plaintiff alleges that this arises under the Fifth, Fourteenth, and Eighth Amendment. At all times relevant to the alleged civil rights violations, Plaintiff was a pre-trial detainee. The Eighth Amendment does not apply to pre-trial detainees, so it is inapplicable to this case. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Shouse v. Price*, 294 F. App'x 426, 427 (10th Cir. 2008). The Fifth Amendment applies to a pretrial detainee against a *federal* official and the Fourteenth Amendment applies to a pretrial detainee against a *state* official. *Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) (citing *Bell*, 441 U.S. at 536). Because Plaintiff is making claims against state officials, these allegations arise under the Fourteenth Amendment.

[2] The Court does not consider this claim as Plaintiff has not alleged grounds for this Court's subject matter jurisdiction for such a claim. *Sac & Fox Nation of Okla. v. Cuomo*, 193 F.3d 1162, 1165 (10th Cir.1999) ("[F]ederal question jurisdiction must appear on the face of the complaint. . . ."). Given that the Court finds that the Franklin County Defendants are properly granted summary judgment with respect to the constitutional claims, there also is no supplemental jurisdiction over the claims. *See* 28 U.S.C. § 1367(c).

1

summary judgment (Doc. 41). The motion is fully briefed, and the Court is prepared to rule. For the reasons stated below, the Court finds that the Franklin County Defendants are properly granted qualified immunity. Therefore, summary judgment is granted in their favor.

## I.      Legal Standard

### A.      Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[3] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[4] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[5] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[6] An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[7]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[8] In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim;

---

[3] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[4] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[5] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[6] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[7] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[8] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[9]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[10]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[11]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[12]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[13]

Where, as here, the plaintiff proceeds *pro se*, the court must construe the plaintiff's filing liberally and afford the plaintiff's filing some leniency.[14]  Additionally, "[c]ourts must take added precautions before ruling on a motion for summary judgment when a *pro se* litigant is involved . . . especially when enforcing these [technical] requirements might result in the loss of the opportunity to prosecute or defend a lawsuit on the merits."[15]  At the same time, it is not the

---

[9] *Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[10] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[11] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[12] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[13] *Adams*, 233 F.3d at 1246.

[14] *Hall v. Bellmon*, 935 F.2d 1106, 1110 (D. Kan. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972)); *Azim v. Tortoise Capital Advisors, LLC*, No. 13-2267-DDC-JPO, 2016 WL 3405126, at *5 (D. Kan. June 21, 2016).

[15] *Wilson v. Skiles*, No. 02-3190-JAR, 2005 WL 466207, at *1 (D. Kan. Feb. 4, 2005) (citing *Hass v. U.S. Air Force*, 848 F. Supp. 926, 929 (D. Kan. 1994)).

proper function of a district court to assume the role of advocate for a *pro se* litigant, and *pro se* parties are expected to follow the Federal Rules of Civil Procedure, as all litigants must.[16]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[17]

## B.  Qualified Immunity

Defendants move for summary judgment on Plaintiff's excessive force and deprivation of access to courts claims in violation of the Fourteenth Amendment, on the basis that they are protected by qualified immunity and are thus entitled to judgment as a matter of law.  Qualified immunity protects public officials performing discretionary functions unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."[18]  Qualified immunity leaves "ample room for mistaken judgments," protecting "all but the plainly incompetent or those who knowingly violate the law."[19]

As the Tenth Circuit explained in *Rojas v. Anderson*, "because qualified immunity is designed to protect public officials from spending inordinate time and money defending erroneous suits at trial," the qualified immunity defense triggers a modified summary judgment standard.[20]  The initial burden rests on the plaintiff, rather than the defendant; and the plaintiff must first "clear two hurdles:" (1) demonstrate that the defendant violated his constitutional or statutory rights; and (2) demonstrate that the right was clearly established at the time of the

---

[16] *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991); *McDaniels v. McKinna*, 96 F. App'x 675, 578 (10th Cir. 2004).

[17] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[18] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[19] *Malley v. Briggs*, 475 U.S. 335, 341 & 343 (1986).

[20] 727 F.3d 1000, 1003 (10th Cir. 2013).

alleged unlawful activity.[21]  The court may decide the appropriate order to consider these issues.[22]  Only if the plaintiff clears these hurdles does the burden shift back to the movant defendant to make the traditional showing that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law.[23]

In determining whether the plaintiff has demonstrated a violation of his constitutional or statutory rights and that the right was clearly established at the time, the court must view the facts and draw reasonable inferences in the light most favorable to the party opposing summary judgment.[24]  In *Scott v. Harris*, the Supreme Court held that "[T]his usually means adopting . . . the plaintiff's version of the facts," unless that version "is so utterly discredited by the record that no reasonable jury could have believed him."[25]  In *Scott*, the plaintiff's version of the facts was discredited by a videotape that completely contradicted plaintiff.  Thus, although the court should generally accept the non-movant plaintiff's version of the facts and draw reasonable inferences in the light most favorable to the plaintiff, the Court need not accept alleged facts that are contradicted or discredited by the record.  Moreover, citing to the *Scott* decision, the Tenth Circuit has held that "because at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record."[26]  In that sense, the court does not discard the Rule 56 process, but relies upon facts supported by the record, while viewing those facts and reasonable inferences therefrom, in the light most favorable to plaintiff.

---

[21] *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)); *see also Gutierrez v. Cobos*, 841 F.3d 895, 900–01 (10th Cir. 2016).

[22] *Camreta v. Greene*, 131 S. Ct. 2020, 2031–32 (2011).

[23] *Rojas*, 727 F.3d at 1003–04; *see also Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001) ("If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity.").

[24] *Rojas*, 727 F.3d at 1004 n.5.

[25] 550 U.S. 372, 378–80 (2007); *see also Blackwell v. Strain*, 496 F. App'x 836 (10th Cir. 2012).

[26] *Thomson v. Salt Lake City*, 584 F.3d 1304, 1312 (10th Cir. 2009) (internal quotations and citations omitted).

## II.     Uncontroverted Facts

The Franklin County Defendants have filed a *Martinez* Report.[27]  The *Martinez* Report is

an administrative record, assembled by the prison, that documents the factual investigation of a

detainee's claim.[28]  Plaintiff failed to controvert any of the facts in the *Martinez* Report

submitted by the Franklin County Defendants.  Plaintiff submitted a number of additional facts,

but most were not material to the dispute herein, conclusory statements, or unsupported by

evidence in the record.[29]  Thus, the Court disregards those additional facts.  The Court does not

accept factual allegations that are utterly discredited by the record such that no reasonable jury

could believe them.  Finally, the Court views these uncontroverted facts in the light most

favorable to Plaintiff and draws all reasonable inferences in the light most favorable to Plaintiff.

The following facts are uncontroverted.

Plaintiff was arrested for arson on or about August 9, 2015, at which point he was booked

into the Franklin County jail.  At all times relevant to the Amended Complaint, Plaintiff was a

pretrial detainee in the Franklin County jail while awaiting trial on a felony arson charge.[30]  At

all times relevant to the Amended Complaint, the Franklin County Defendants were officers

---

[27] Doc. 32.

[28] The Tenth Circuit endorsed the use of *Martinez* Reports in *Martinez v. Aaron*, 570 F.2d 317, 319 (10th Cir. 1978).  The Court considers the *Martinez* Report as part of the summary judgment record and treats the report like it would an affidavit.  If Plaintiff presents no evidence conflicting with the factual findings contained in the *Martinez* Report, the Court may treat those findings as uncontroverted facts.  *Cf. Northington v. Jackson*, 973 F.2d 1518, 1521 (10th Cir. 1992) (explaining that a court cannot accept the factual findings of a *Martinez* Report if the prisoner presents conflicting evidence); *Breedlove v. Costner*, 405 F. App'x 338, 343 (10th Cir. 2010).

[29] Doc. 41 ¶ 2, 3, 4, 5, 7, 8.  In ¶ 6, Plaintiff asserted that he was diagnosed with a sprained neck in the emergency room on October 6, 2015 after he was released on bond.  However, the evidence submitted only showed an activity restriction and standard discharge instructions relating to the October 6, 2015 visit.  Doc. 45, Ex. 2.  The court sustains Defendants' objection that these records are unauthenticated because Plaintiff has failed to verify the documents through a supporting affidavit from a records custodian, health care provider, or anyone else with personal knowledge of the facts contained in the exhibits.  *See* Fed.R.Civ.P. 56(c) & (e); D. Kan. Rule 56.1(d).  Therefore, although this fact may be material, it is improperly supported and the Court does not consider it.

[30] *State v. Kirkland*, 2015-CR-000232 (Aug. 11, 2015) (citing violations of K.S.A. § 21-5812(a)(1)(C), (c)(1)(B); § 21-6804; § 21-6807).

and/or administrators at the Franklin County jail.  While in detention in the Franklin County jail, Plaintiff was generally represented by counsel.[31]  Plaintiff was briefly and intermittently unrepresented following the withdrawals of several of his attorneys.

Plaintiff was housed in solitary confinement, Cell 120, for extended periods during his detention.  Plaintiff was assigned to solitary confinement pursuant to his own request.  Plaintiff demanded a solitary cell because he told Franklin County jail officers that he was afraid to interact with the general population and thought people were out to get him.  Specifically, he believed that his "ex-wife's drug dealers" were going to have him killed.  Jail staff who interacted with Plaintiff found him to be paranoid and volatile.  From the perspective of jail staff, Plaintiff's volatile and paranoid personality made him an unpredictable detainee.

The Franklin County jail's general population areas contain kiosks that permit detainees in the jail to arrange and/or conduct visits, make communication requests, access email, check their accounts, and submit grievances.  The kiosks are also the sole system by which detainees submit commissary orders.  Detainees with access to a kiosk can place commissary orders by using an electronic kiosk before the cut-off time on Wednesdays.  Commissary orders are delivered one per week.  Unlike general population housing, solitary cells do not have access to the aforementioned kiosks.  Thus, Plaintiff, while in solitary confinement in Cell 120, could not access these kiosks to place commissary orders for writing supplies.

Nonetheless, jail staff assisted Plaintiff in obtaining writing supplies needed for communication with courts or attorneys.  Specifically, Administrative Corporal Hollon provided paper and pens to Plaintiff on multiple occasions and assisted him with buying two phone cards.

---

[31] The Court ordered appointed counsel on August 12, 2015.  Defendant had three different counsel between August 2015 and October 2015.  Doc. 30-11.  Counsel Jack Hobbs represented him from August 12-31, 2015.  Counsel Sue DeVoe represented him from September 18-24, 2015.  Counsel Craig Cole represented him from September 28, 2015 to beyond the relevant time period for the Complaint.

Officer John Niccum supplied copy paper to Plaintiff on two occasions.  Officer Matt Zweifel and Corporal Hollon hand delivered papers for Plaintiff to his attorney and the judge at the Franklin County Courthouse on multiple occasions.  Officer Zweifel and Corporal Hollon delivered documents to the Franklin County Courthouse in this manner so that Plaintiff would not need to use stamps.

Plaintiff qualified as indigent and received writing supplies, along with other items, in a weekly "indigence kit."  Plaintiff was also allowed to receive lined paper from his attorney if he preferred it.  While Plaintiff was represented by defense attorney Jack Hobbs, Administrator Wadkins discussed with Counsel Hobbs Plaintiff's indigence kit, including the writing supplies, and Counsel Hobbs indicated these supplies were satisfactory.

On August 26, 2015, Plaintiff was in a solitary confinement room, Cell 120, which is located near the booking area of the jail.  Cell 120 is also near an interview room, an elevator, a staff bathroom, the control room, the door to the sally port (where detainees are brought into the jail), and the elevator.  On August 26, Plaintiff positioned himself at the door of his cell and began screaming obscene and abusive language.  Officer Larios, Officer Wilson, Officer Zweifel, and Officer Nick Grey heard Plaintiff yelling and became concerned.

Plaintiff's yelling carried throughout the area.  When detainees yell in a manner similar to Plaintiff, this creates concerns for the Franklin County jail staff because of the potential for further disruption by other detainees and for the resulting safety and security concerns that such a disruption could create.  Officers know that when a detainee begins screaming, as Plaintiff was doing, he may soon become violent and attempt to injure himself.  In addition, during this particular event, there was concern because a member of the Ottawa Police Department was using the nearby interview room to conduct and record an interview with another detainee.

Franklin County jail officers were concerned Plaintiff's screaming would disrupt the interview or ruin the recording.

In light of the concerns described above, Officer Grey and Officer Larios approached Plaintiff's room, and Officer Grey attempted to speak with Plaintiff through the door in an attempt to calm him.  Officer Grey asked Plaintiff to stop yelling and told Plaintiff he would be moved to a "detox room" if he did not cease.  A detox room was suggested because it is a padded space whereas the other cells, including Cell 120, are not.  A detox room is provided as a safe place for detainees to de-escalate when needed.

When Plaintiff did not stop screaming, Officer Grey and Officer Larios then entered Plaintiff's room and began to speak with him.  Once inside, Plaintiff lowered his volume somewhat but continued to use obscene and abusive language toward the officers.  For example, at this point, Plaintiff was calling Officer Grey "bitch" and yelling "what's your fucking name?" Officer Grey gave Plaintiff a final instruction to cease cursing, but Plaintiff continued to curse.

After refusing to comply with requests, Officer Grey and Officer Larios placed their hands on Plaintiff's arms to stand him up and move him to the detox room.  In response to Officer Grey and Officer Larios touching him, Plaintiff tensed his upper body.  Based on Officer Grey and Officer Larios' experience, tensing of the body, such as they observed from Plaintiff, meant he was preparing to fight, flee, and/or cause the officers to lose their grip on his arm. Officer Grey and Officer Larios were concerned Plaintiff's behavior created a serious safety issue.  If Plaintiff either fought or fled, he presented possibly significant risks to the health and safety of the officers, himself, and any other individuals in the areas to which he might flee. Specifically, if Plaintiff had succeeded in shaking off the officers and fleeing, he would have had access to a number of rooms, hallways, and closets.  Several of these rooms were unlocked,

including the room in which a member of the Ottawa Police Department was interviewing an uninvolved party.

After Plaintiff tensed his body, Officer Grey and Officer Larios began to move Plaintiff toward the floor in an attempt to place Plaintiff in handcuffs.  During this move, Officer Larios held Plaintiff's head under his chin with some help from Officer Wilson.  Based on Officer Grey and Officer Lario's experience, they were taught that it is common for agitated detainees to spit or bite others or themselves, and/or to repeatedly bang their own heads against the floor.  Thus, because of these behaviors, monitoring or holding a detainee's head can be an important safety measure for jail staff to take to protect themselves and detainees from harmful behavior.  Plaintiff used his chin to pin and hold Officer Larios' arm in position around his head.

Officers Niccum, Wilson, and Zweifel entered the cell to assist Officers Grey and Larios.  When a detainee requires handcuffing or transfer, it is Franklin County jail practice and protocol that all available officers assist in order to decrease safety risks.  These safety risks for moving detainees include, but are not limit to, the risk of biting, spitting, kicking, punching, headbutting, and object throwing.

Once the other officers entered the room, Plaintiff continued to resist and refused to provide his right arm for handcuffing.  The Ottawa police officer who had been conducting the interview in the nearby room also entered Plaintiff's room and pulled out his Taser.  Officer Zweifel instructed Plaintiff to provide his arm and warned him of the Taser.  Plaintiff complied and surrendered his right arm.  The Taser was never deployed.  As soon as Plaintiff supplied his arm, the officers applied handcuffs and immediately drew Plaintiff to his feet.  From the time

that Plaintiff was moved to the floor to the time that he was returned to his feet, fewer than sixty seconds elapsed.[32]

Once on his feet, officers escorted Plaintiff to the detox room. In the detox room, the officers placed Plaintiff on his stomach, asked him to remain still, and immediately removed the handcuffs. [33] Officers then left the detox room. After several minutes, Officer Grey entered the detox room and engaged Plaintiff in conversation. Officer Grey asked Plaintiff if he was alright to which Plaintiff replied he was. Officer Grey explained that Plaintiff had been placed on the floor and handcuffed because Plaintiff had become physically resistant.

While Plaintiff remained in the detox room, he received a meal and engaged in additional calm conversation through the door. After a few hours, Plaintiff was asked if he would like to leave the detox room. Plaintiff was taken directly to the nurse's office where he was examined. The Franklin County jail policy and protocol is to take detainees to see a nurse if possible and practical—assuming one is on-duty and available—after any incident involving the application of physical contact between an officer and a detainee. The nurse is given exclusive discretion as to whether a detainee should receive further medical attention.

The nurse on duty on August 26, 2015 examined Plaintiff, including his eye and elbow, and noted that he had a small scab and mild swelling under his right eye. He did not appear to

---

[32] Plaintiff attempts to contradict this fact by stating "[i]t does not take trained law enforcement jailers 60 seconds to effect handcuff placement on a 55 year old disabled citizen." Doc. 41 at 1. He then attaches Ex.1, which includes medical records providing that he has mild to moderate back pain as assessed by a doctor in 1996 and 2008. The Court does not find that this contradicts the fact that it took officers sixty seconds to get Plaintiff into handcuffs as this was evidenced by the video recording submitted by Defendants. The Court also does not find that the medical records submitted show disability. Rather, the medical records submitted show minor to moderate back pain nearly seven years prior to the August 26 incident. Further, these records are not properly authenticated, and the Court does not consider them.

[33] Plaintiff attempts to contradict this fact by asserting he was "thrown into detox and remain[ed] half conscious on the concrete floor." Ex. 41 at 3. However, Plaintiff submits no evidence he was "half conscious" or "thrown" into the detox room. In fact, the video evidence provided reflects that he was placed on the floor on his stomach, and he was conscious during such time.

have other injuries.  The nurse informed Plaintiff that he had no injuries requiring further medical attention.  The nurse only suggested ice for Plaintiff's sore elbow and eye.

Officer Jordan Powell, who Plaintiff has named and served in relation to his excessive-force allegations, was not working or on site at the jail on August 26, 2015.  Administrator Wadkins did not personally participate in the aforementioned physical encounter with Plaintiff, but reviewed videotape of it.  After reviewing the video, Administrator Wadkins evaluated staff performance and determined that no policy violations occurred.  None of the officers involved required discipline for any violation of policy.

The Office of the Franklin County Attorney received a complaint from Plaintiff concerning the aforementioned physical encounter, alleging criminal action on the part of the officers involved.  The County Attorney's office reviewed the incident and evidence, including the video.  The County Attorney's office did not find sufficient evidence to warrant further investigation or the filing of any charges.[34]

Plaintiff remained in custody until he made bond on October 2, 2015.  He continues to await trial on the felony arson charge.

## III.    Discussion

## 1.    Excessive Force

Defendant alleges that Officer Larios and Officer Wilson, along with Matt Doe, John Doe I/ "Nick," John Doe III, and John Doe V, used excessive force when transferring him from Cell 120 to the detox room on August 26, 2015.  Although frequently the court analyzes separate qualified immunity for different defendants, the Tenth Circuit has recognized that officer

---

[34] Plaintiff attempts to contradict this fact by asserting that he used the administrative procedures to file his grievance on September 2, 14, 19, 24, 29, 30, 2015, but he received no response.  Doc. 41 at 2; Doc. 18 at 5.  He puts forward no evidence as to this fact.  Further, it is clear that when asked to review his grievance, the Franklin County Attorney's Office and Administrator Wadkins responded and reviewed the incident.

conduct may be aggregated at the summary judgment phase of excessive force cases.[35]  As a preliminary matter, because Officer Jordan Powell is not alleged to be involved in the excessive force count and was not working on August 26, summary judgment is properly granted in his favor.  As to the other officers, because Defendant alleges that all officers were active and joint participants in the use of force, the Court will analyze the officers as a group instead of individually.

The Court initially considers the first prong of the qualified immunity analysis, which asks whether the Franklin County Defendants used excessive force in violation of Plaintiff's Fourteenth Amendment due process rights.  It is well-established that the Fourteenth Amendment governs any claim of excessive force brought by a pretrial detainee—one who has had a judicial determination of probable cause as a prerequisite to the extended restraint of his liberty following arrest.[36]  Plaintiff was at all relevant times a pretrial detainee, so the Fourteenth Amendment is applicable.  Under the Fourteenth Amendment, the Supreme Court in *Kingsley v. Henderson*[37] announced that "the appropriate standard for pretrial detainee's excessive force claim is solely an objective one."[38]  Therefore, a pretrial detainee must make a showing that the force purposefully or knowingly used against him was objectively unreasonable.[39]  Courts are

---

[35] *Estate of Booker v. Gomez*, 745 F.3d 405, 421 (10th Cir. 2014) (quoting *Bell v. Wolfish*, 441 U.S. 520, 536 (1979)).

[36] *Id.* at 419.  The Tenth Circuit has explained that excessive force claims may fall under the Fourth, Fifth, Eighth or Fourteenth Amendment.  *Id.* The Tenth Circuit has explained the differentiation as follows:

> Any force used leading up to and including an arrest may be actionable under the Fourth Amendment's prohibition against unreasonable seizures.  By contrast, claims of excessive force involving convicted prisoners arise under the Eighth Amendment.  And when neither the Fourth nor Eighth Amendment applies—when the plaintiff finds himself in the criminal justice system somewhere between the two stools of an initial seizure and post-conviction punishment—we turn to the due process clauses of the Fifth or Fourteenth Amendment and their protection against arbitrary governmental action.

[37] 135 S. Ct. 2466, 2473 (2015).

[38] *Id.* at 2473.

[39] *Id.*

not to apply the standard mechanically, so it must consider the facts and circumstances of each case "from the perspective of a reasonable officer on the scene."[40]  In determining whether force was objectively unreasonable, the Court may consider the following discretionary, nonexhaustive factors:

> (1) the relationship between the need for the use of force and the amount of force used;
> (2) the extent of plaintiff's injury;
> (3) any efforts to temper or limit the amount of force;
> (4) the severity of the security problem at issue;
> (5) the threat reasonably perceived by the officer;
> (6) whether the plaintiff was actively resisting.[41]

The Court must account for the "legitimate interests that stem from [the Government's] need to manage the facility in which the individual is detained."[42]  The Court must defer when appropriate to the policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security.[43]

Applying the factors set out in *Kingsley* and considering the totality of the circumstances, the Court concludes that no reasonable juror could find that Officer Larios and Officer Wilson violated Plaintiff's constitutional rights by using excessive force in violation of the Fourteenth Amendment.  Viewed in the light most favorable to Plaintiff, the evidence does not demonstrate that the force employed against him was objectively unreasonable.  Thus, Plaintiff has not met his burden to overcome the first prong of the qualified immunity analysis, so the burden need not shift back to Defendant and the Court need not consider the second prong.

---

[40] *Id.* ("A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.").

[41] *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

[42] *Id.*

[43] *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

In this case, there was a clear need for a use of force in order to handcuff Plaintiff and transfer him to the detox room.  Plaintiff was screaming obscene and abusive language in Cell 120.  Officer Grey told Plaintiff to cease cursing out of concern that it would disturb other inmates or cause other safety concerns.  Officer Grey also testified that he knew screaming often led to self-inflicted harm.  After warning Plaintiff to cease cursing or he would be taken to a detox room, Plaintiff continued to scream.  Officer Grey and Officer Larios entered Plaintiff's cell to talk to Plaintiff and get him to cease screaming.  He did lower his voice, but he continued to use obscene language toward the officers.  Officer Grey warned him that if he continued to curse, he would be handcuffed and taken to the detox room.  Immediately following that directive, Plaintiff continued to curse, so Officer Grey and Larios grabbed an arm to stand him up to handcuff him.  He then attempted to tense his body, which Officer Grey and Larios—based on experience—believed meant he was attempting to flee or fight.  Officer Grey and Officer Larios decided to take him to the floor to prevent his escape from the cell, which would have allowed him access to a number of unlocked rooms including an interview room that was in use.  Officer Larios put his arm around Plaintiff's neck to prevent harm to Plaintiff or the other officers.  Once on the floor, Plaintiff refused to comply with multiple requests to give his arm to put him in handcuffs.  Plaintiff only complied once threatened with a Taser, which was never deployed.  This transfer from standing to the floor and being put in handcuffs happened over the span of less than one minute.  Given Plaintiff's refusal to comply, the force used to take Plaintiff from standing to the floor was minimal in light of the clear concerns to the health and safety of Plaintiff and the officers involved.

Plaintiff suffered relatively minor injuries given the medical records submitted by the nurse who evaluated him only hours later.  The nurse noted that Plaintiff had a scab under his

right eye and minor swelling.  Given the Court's instruction to view all evidence in a light most favorable to Plaintiff, the Court assumes that this injury was sustained as a result of the force employed in Cell 120 on August 26.  Plaintiff was told to use ice, but no further medical evaluation was required.  Further, it is clear that the injuries were minor because when Officer Grey entered the detox room several minutes after the force at issue was employed, Plaintiff insisted that he was alright when Officer Grey questioned him.  Plaintiff has submitted no admissible evidence that he required further medical assistance.  There was no significant injury sustained on August 26 even viewing the evidence in a light most favorable to Plaintiff.

Officer Grey and Officer Larios warned Plaintiff twice before attempting to handcuff him and take him to the detox room.  The first warning was given by Officer Grey through the door of Cell 120.  After a complete failure to comply, Officer Grey and Officer Larios entered the cell in an attempt to calm Plaintiff.  Officer Grey told Plaintiff to stop cursing or he would be handcuffed and taken to the detox room.  Plaintiff did not comply with the request.  Plaintiff then failed to give his arms to the officers and tensed his body when he was stood up.  Based on Officer Grey and Officer Larios' experience, this presented a serious safety concern.  When Plaintiff was taken to the ground, he still would not give his arm to be handcuffed and only complied when threatened with a Taser.  The officers used significant effort to get Plaintiff to comply before force was ever employed.

Based on the evidence presented, there was a serious security threat perceived by the officers.  Prior to August 26, the Franklin County jail staff had concluded Plaintiff was extremely paranoid and volatile.  From the perspective of jail staff, Plaintiff's volatile and paranoid personality made him an unpredictable detainee.  On August 26, Plaintiff was screaming obscenities from inside his room.  This presented a disruption to the management of the facility,

including disrupting other detainees and an interview going on in a nearby room.  Also, based on

the officers' experience, they knew that an agitated detainee can present a safety concern to

himself or herself, including punching walls or hitting their heads.  Officer Grey and Officer

Larios could not get Plaintiff to comply when confronted outside or inside Cell 120.  To protect

from self harm or harm to officers, Officer Grey and Officer Larios attempted to transfer him to

the detox room, which was padded.  Plaintiff refused to be handcuffed without incident.  Because

Plaintiff tensed his body, Officer Grey and Officer Larios knew, based on training, that this

meant he was likely attempting to flee or fight.  This presented a security concern because there

were nearby areas, including booking, interview rooms, and the sally port, that would be

accessible if he were to get loose.  Upon taking him to the floor, Officer Larios put his hand

around Plaintiff's neck to secure it as spitting, biting, and self-inflicted injuries were of concern.

Once Officer Larios and Officer Grey took Plaintiff to the floor, other officers, including Officer

Wilson, entered Cell 120 to help with the transfer.  This is practice and protocol of the facility to

ensure that officers and the detainee are kept safe.  Given the safety concern presented, the Court

finds that the amount of force was reasonable to keep both Plaintiff and the officers safe.

There is evidence, including the video of the encounter, showing that Plaintiff actively

resisted reasonable requests from Officer Grey and Officer Larios.  Officer Grey asked Plaintiff

through the door of the cell to cease screaming obscenities.  He did not comply.  Officer Grey

and Officer Larios entered the cell and calmly requested that Plaintiff cease shouting obscenities.

He did not comply.  He was told he was being handcuffed and taken to the detox room, but he

tensed his body, refusing to be handcuffed.  When taken to the floor, he was told to give his hand

to be handcuffed and he did not comply.  Officer Zweifel told him to give his arm or he would be

subjected to a Taser.  It was only at this point that Plaintiff complied.  Plaintiff actively resisted

even after the force was employed.  By the Court's count, Plaintiff refused reasonable requests and resisted four times before finally complying.

Plaintiff also claims that Administrator Wadkins and Corporal Hollon are responsible for the excessive force because he "submitted complaints none [of which] have been answered."[44] However, the evidence in the record contradicts this assertion.  Administrator Wadkins reviewed the footage of the incident and determined no policies were violated.  Further, the Franklin County Attorney reviewed the footage upon receipt of Plaintiff's complaints.  It also determined no policies had been violated.  Thus, the Court rejects Plaintiff's assertion that Administrator Wadkins and Corporal Hollon are responsible for failure to address his complaints following the August 26 incident.

Courts have frequently held that use of some force against a detainee is reasonable where the detainee has refused to comply with an order, so this Court finds that this case falls squarely with the weight of authority.[45]  Given all the evidence in the record, it is clear that the force used by the officers, including Officer Larios and Officer Wilson, was objectively reasonable and not excessive in light of the serious safety and security concerns posed.  Therefore, there was no violation of Plaintiff's Fourteenth Amendment rights with use of excessive force.  Because Plaintiff has failed to meet his burden as to the first prong, qualified immunity is properly

---

[44] Doc. 18 at 7.

[45] *Compare Mahamed v. Anderson*, No. 07-4815, 2009 WL 873534, at *3 (D. Minn. Mar. 30, 2009) (finding that handcuffing and pushing a detainee into a wall, and then holding him down to the floor by placing a knee into his back, was not excessive when detainee refused directives to go to lockdown); *Blount v. Echols*, No. 07-5046, 2008 WL 4368936, at *8 (W.D. Ark. Sept. 24, 2008) (finding no excessive force where pretrial detainee pinned against wall for repeatedly refusing to comply with staff order to move to back of cell), *with Carter v. Hassell*, No. 05-2259, 2009 WL 3762347, at *6 (E.D. Mo. Nov. 10, 2009) (denying qualified immunity where official hit detainee during a fight that resident did not resist, participate in the fight, or pose a security threat).

granted in favor of Officer Wilson, Officer Powell, and Officer Larios on the excessive force claim.[46]

## 2.    Deprivation of Access to Courts

Defendant alleges that Corporal Hollon and Administrator Wadkins denied him access to the courts in violation of the Fourteenth Amendment.  Specifically, he alleges that he was deprived of commissary for 21 days while he was in solitary confinement.  Thus, the Court initially considers the first prong of the qualified immunity analysis, which asks whether Corporal Hollon and Administrator Wadkins deprived Plaintiff of access to the courts in violation of his Fourteenth Amendment due process rights.

The Due Process Clause of the Fourteenth Amendment guarantees a constitutional right of access to the courts.[47]  To bring a claim for violation of this constitutional right, a prisoner must show that he has suffered, or will suffer, actual harm.[48]  However, this injury requirement is not satisfied by just any type of frustrated legal claim.[49]  Rather, "an inmate must go one step further" by demonstrating that the "denial of legal resources hindered the prisoner's efforts to pursue a nonfrivolous claim."[50]

First, Plaintiff has failed to provide evidence that he was denied access to writing utensils and paper to communicate with his attorneys and the court while in solitary confinement.  There is evidence that multiple officers gave him paper and pencils, including Corporal Hollon and

---

[46] *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) ("If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.").

[47] *Green v. Johnson*, 977 F.2d 1383, 1389 (10th Cir.1992) (citing *Ward v. Kort*, 762 F.2d 856, 858 (10th Cir. 1985)).

[48] *Bounds v. Smith*, 430 U.S. 817, 828 (1977).

[49] *See Lewis v. Casey*, 518 U.S. 343, 349 (1996) (explaining that the requirement that an inmate show actual injury derives from the doctrine of standing).

[50] *Id.* at 354.

Administrator Wadkins.  He also was given writing supplies in a weekly indigent kit.  His defense counsel was apprised of the supplies he would be given and determined it sufficient.  Further, he was deprived of access to the commissary by choosing to stay in solitary confinement.  However, even though he did not have commissary access, the Franklin County jail staff provided him utensils and paper.  He was denied access to stamps because the officers walked his communication to the court and his attorneys by hand, which is an adequate substitute for the stamps.  Thus, Plaintiff has failed to provide evidence that he was denied means to communicate.

Second, even assuming that he was denied means of communication, Plaintiff has provided no allegation that he was prejudiced in pursuing his legal claims.  In fact, Plaintiff makes no allegations relating to whom he was trying to communicate with.  Thus, Plaintiff has failed to make a showing that he was deprived access to the courts in violation of the Fourteenth Amendment.  Because Plaintiff has not sufficiently met his burden under the first prong of the qualified immunity analysis, Corporal Hollon and Administrator Wadkins are properly granted qualified immunity.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants Marcel Larios, Troy Wilson, Jordan Powell, Justin Wadkins and Sarah Hollon's Motion for Summary Judgment (Doc. 34) is **granted** on the grounds that they are properly entitled to qualified immunity.

**IT IS SO ORDERED.**

Dated: February 28, 2017

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE